## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| **OPAL HOGG AND TRAMPAS RAY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action File No.** |
| **v.** | ) | _____ |
| | ) | |
| **JINDAL FILMS AMERICAS, LLC,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiffs, Opal Hogg and Trampas Ray file this Complaint for relief, and respectfully show the Court as follows:

## PRELIMINARY STATEMENT

### 1.

This civil rights action is brought pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000a, 2000e, & *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1973, 29 U.S.C. §§ 621-634, and supplemental Georgia state law claims. Plaintiff Opal Hogg was subjected to discrimination based on her sex, age, national origin, retaliation, and hostile environment in violation of Title VII and the ADEA, and was retaliated against after engaging in a protected activity. Plaintiff

Opal Hogg was further subject to retaliation including wrongful termination as a result of the exercise of her rights under Title VII and otherwise. Plaintiff Trampas Ray was subjected to retaliation after he exercised his rights under Title VII and other wise and complained about the discrimination suffered by his sister, Plaintiff Opal Hogg, and others who worked for Defendant. Plaintiff Trampas Ray was also discriminated against based on his age. Plaintiffs seek injunctive and equitable relief, back pay, front pay, compensatory, and liquidated damages to remedy these civil rights violations, as well as punitive damages, attorneys' fees and expenses.

## JURISDICTION AND VENUE

2.

The Court has subject matter jurisdiction under Title VII 42 U. S. C. §§ 2000e, et seq., as amended, ADEA, 29 U.S.C. § 626(c); and 28 U.S.C. § 1331 & § 1343(a)(4); 29 U.S.C. § 206(d); 28 U.S.C. § 1367.

3.

Liquidated damages are sought pursuant to 29 U.S.C. §§ 626(b), and 617(a). Compensatory and punitive damages are sought pursuant to 42 U.S.C. § 1981a, 29 U.S.C. § 2617(a), and state law. Attorneys' fees and expenses of litigation are sought pursuant to 42 U.S.C. §§ 1988, 2000e-5(k), 29 U.S.C. §§ 216(b), 260, 2617(a), Fed. R. Civ. P. 54, and state law. Equitable relief is sought under 29 U.S.C. § 2617(b), and state law.

4.

Venue properly lies in the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. § 1391(b) (venue generally) and Local Rule 3.1, N.D. Ga., because Defendant conducts business in the Northern District of Georgia and all of the unlawful employment acts and the violations of Plaintiffs' federal and state rights as described herein were committed in this district.

5.

Plaintiffs satisfied the statutory prerequisite under 42 U.S.C. § 2003e5(b)(e) by filing a charge with the EEOC prior to bringing this suit.  On February 16, 2022, within 180 days of the last date of discrimination, Ms. Hogg filed charge No. 440-2022-0338 charging discrimination based on sex, age, national origin, retaliation, and hostile environment in violation of Title VII and the ADEA.  After the retaliation and termination for filing the first charge, Ms. Hogg filed Charge No. 410-2023-07616 on May 5, 2023, charging retaliation.  On September 7, 2023, Mr. Ray filed charged No. 410-2023-11808, alleging retaliation in violation of Title VII and the ADEA.   A true and correct copy of the charges are attached hereto as Exhibit "A" for Ms. Hogg, and "B" for Mr. Ray, respectively, are incorporated herein by reference.

6.

More than 180 days have passed since the filing of the Charges without determination by the EEOC.

7.

The EEOC issued Dismissal and Notice of Rights to sue on Ms. Hogg's first Charge No. 410-2022-0338, and on Hogg's second Charge 410-2023-07616, both of which were received by Ms. Hogg on April 25, 2024, which was received on that date; and on Mr. Ray's Charge No. 410-2023-11808, which was received by Mr. Ray on April 24, 2024, all of which were issued less than ninety (90) days prior to the filing of the Complaint. True and correct copies of the three Notices are attached hereto collectively as Exhibit "B".

## **PARTIES**

8.

Plaintiff Opal Hogg is an adult citizen and resident of the United States in Troup County, Georgia. Plaintiff Trampas Ray is also an adult citizen and resident of the United States in Troup County, Georgia.

9.

Plaintiff Trampas Ray and Plaintiff Opal Hogg are siblings and worked at the Employer and its predecessor for many years, as described more fully herein.

Plaintiff Ray is therefore within the zone of interests that Title VII seeks to protect in relation to his sister. Plaintiff Hogg.

10.

Defendant Jindal Films Americas LLC ("Jindal", "Employer", and "Company"), is a foreign limited liability corporation, incorporated in Delaware. Although it is incorporated in Delaware and considers itself as "foreign," its principal place of business is located at 411 Pegasus Parkway, LaGrange, GA, 30240. Defendant may be served with the Complaint and Summons by serving its registered agent, Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corners, GA, 30092.

11.

Plaintiff Ray alleges herein that he was terminated because he complained about the treatment of Ms. Hogg and engaged in protected activity in opposing discrimination, and also because he was in the "zone of influence" based on his relationship to Plaintiff as her brother, after her complaints about discrimination and harassment in Violation of Title VII and the ADEA.

12.

The same nucleus of operative facts exists for both Ms. Hogg and Mr. Ray that serves as the basis for the torts committed against them by Defendant as described herein.

13.

Many questions of law and fact are the same for both Plaintiff Ray and Plaintiff Hogg as alleged in this Complaint.

14.

Plaintiff Ray and Plaintiff Hogg are asserting in this Complaint requests for relief that arises out of the same transaction, occurrence, or series of transactions or occurrences, as described more fully herein.

15.

Plaintiff Ray and Plaintiff Hogg are therefore permitted to be joined as plaintiffs together in one lawsuit pursuant to Federal Rule of Civil Procedure 20.

## STATEMENT OF FACTS

**Facts as to Ms. Hogg and**
**and Company Environment and Actions**

16.

As of the filing of this Complaint, Plaintiff Opal Hogg is a sixty-three-year-old (63) female of American national origin.  At the time of her termination from Jindal Films, she was sixty-one (61) years old.

17.

Opal Hogg was employed by Exxon Mobile at a plant in LaGrange, Georgia for approximately 32 years, and then in 2013, the plant was purchased by Jindal Films.

18.

After the acquisition, Ms. Hogg remained employed at Jindal Films where she worked until March 17, 2023, after Defendant retaliated against her for filing a Complaint with the EEOC by terminating her.

19.

For the three years prior to her unlawful termination, Plaintiff Hogg worked directly for and reported to the CEO of Jindal Films, Sandeep Singhal, and for approximately 4 months prior to termination, she also reported to Mike Bryant, Plant Manager.

20.

During the time that Ms. Hogg worked for and reported to CEO Singhal, Plaintiff Hogg was subjected to a hostile and discriminatory working environment based on her sex, age, national origin, retaliation, and hostile environment in violation of Title VII and the ADEA.

21.

Mr. Singhal was the primary force of discrimination but also set the tone for others to participate in discriminatory practices by creating a hostile and retaliatory work environment in this Company. As discussed herein, his conduct and other males at the company directed their harassing behavior toward women in general and White American Females specifically.

22.

After Plaintiff Hogg complained about this discrimination and filed an EEOC Complaint, she faced further retaliation including her termination.  Through her last 30 years of employment with Exxon Mobile and then Jindal Films, Plaintiff Hogg received regular raises, exceptional reviews, and was never disciplined.

23.

In addition to performing her own work in accordance with all applicable policies and procedures, Plaintiff Hogg has also performed the job duties of three

(3) other positions because of the high turnover rate at Jindal Films.  Mr. Singhal personally requested that she take on these additional responsibilities, reflecting that even amidst his discriminatory treatment of her, he nevertheless believed that she was competent.

24.

Indeed, Ms. Hogg was required to perform the duties of at least three of Mr. Singhal's female personal assistants.  Upon information and belief, all of these women quit because of the hostile and discriminatory environment or were terminated for pretextual and ultimately discriminatory reasons.

25.

At the time of her termination, Plaintiff Hogg's title was "Plant Administrator."

26.

Nevertheless, CEO Singhal treated Ms. Hogg like a personal assistant, requiring that she do his grocery shopping, making sure that his refrigerator in his apartment was fully stocked, among other personal tasks.

27.

Ms. Hogg was also required to do Mr. Singhal's laundry and dry cleaning.

28.

Ms. Hogg, whose title was Plant Manager, was required to do the following additional administrative tasks for the CEO, who never asked men to complete these tasks: arrange hotels and meet specific bedding needs, call restaurants and arrange for specific menus, travel to get specific food items, and even arrange a particular hairdresser on one occasion. None of these items were supposed to be included in her job responsibilities or duties. Ms. Hogg was also required to perform these tasks for Mr. Jindal, owner, when he was in town.

29.

Mr. Singhal said many times that these duties belonged to or were better suited to women rather than men.

30.

If Ms. Hogg forgot to do these personal tasks for the CEO, he harassed her and loudly shamed and reprimanded her in front of her peers and the all-male leadership team.

31.

The CEO repeatedly called Ms. Hogg all hours of the day and night, regardless of whether she was on leave or vacation.  He did not treat men at the plant in this same way.

32.

The CEO only assigned administrative and cleaning details to women. He has explicitly stated that these tasks are not for male employees.

33.

Mr. Singhal refused to place women in positions of leadership, even when they were well qualified, because he stated to Ms. Hogg and others that he believes leadership positions are best suited for male employees.

34.

One specific example of discriminatory and harassing conduct against Ms. Hogg occurred on or about January 2021. Mr. Singhal yelled at Ms. Hogg in front of others about a lock in the men's restroom that had not been fixed by maintenance the day after he reported it to her. It was embarrassing and humiliating to Ms. Hogg, and it was not even her responsibility to repair these issues.

35.

In another meeting in November 2021, Mr. Singhal again yelled at her in front of the fifteen members of his male leadership team. This time, the CEO screamed at her because the lights were too dim and she should have changed the light bulbs. Ms. Hogg attempted to calmly explain that the maintenance personnel were responsible for these tasks, but Mr. Singhal insisted it was still her fault.

36.

The CEO then began ranting about a broken lock and paper towel holder in the men's restroom, two things over which she of course had no control or knowledge as someone who does not use the men's restroom.

37.

As discussed in these examples and countless others, Mr. Singhal berated Ms. Hogg in front of the male leadership team and treated her as his personal servant.

38.

In August 2021, Singhal berated Ms. Hogg because she did not download his boarding pass for his return flight to Georgia.   She explained that the task was unnecessary because he used the airline app. He blamed Ms. Hogg for frustrating him and not thinking through every step of his trip.

39.

Instead of addressing Mr. Singhal's harassing conduct, the VP of Human Resources, Carey Ellinghaus, joined in on the harassing conduct and comments.

40.

In Ms. Hogg's presence and, upon information and belief on other occasions, the HR VP told women that they should be careful not to order food for lunch that

"causes the hips to spread." He did not make such comments to men about their physical appearance.

41.

As early as January 2021, Ms. Hogg complained to Human Resources about the near constant discrimination she was receiving. Ms. Hogg specifically made her complaint to the VP of Human Resources, Mr. Carey Ellinghaus. He took her verbal report and said he would look into it, while simultaneously excusing Mr. Singhal's behavior.

42.

In response to her complaints, Mr. Ellinghaus said that's just how he is and just how his culture is, both admitting the discriminatory behavior was directed at her gender, age, and national origin, and insinuating that Ms. Hogg should just deal with it because there was no changing the CEO's behavior.

43.

Consistent with the response from the VP of HR, Jindal Films did no investigation whatsoever. No action was taken by Jindal to address any of the numerous complaints Ms. Hogg and other women made, so of course the discriminatory treatment continued and escalated.

44.

Mr. Singhal called women "stupid" and "incompetent." He also used vulgar and foul language with women and screamed and yelled at women, and specifically Ms. Hogg. His yelling and insults only increased after she complained.

45.

Mr. Singhal did not yell and scream at men in the same manner, with the same derogatory terms, or with the frequency and intensity that he did with women. Mr. Singhal debased and dehumanized women generally and singled out Ms. Hogg.

46.

After the complaints, Mr. Singhal subjected Ms. Hogg to extra scrutiny about minute details of tasks she performed that were outside her job responsibilities but related to the personal assisting he was then requiring her to do, after all of his female assistants quit because of his harassment.

47.

Specifically, he scrutinized her calendar entries, lunch orders, travel details, different time zone entries, he yelled at her more, and he began threatening that if she was not competent to do these tasks, he would find someone to replace her.

48.

One specific example of discrimination by Mr. Singhal occurred on our about January 25, 2022.  Mr. Singal called Ms. Hogg into a meeting with his all-male

leadership team and began yelling at her and shaking a dry erase marker because he did not like the markers she had put into the room per his request.

49.

After several minutes of Mr. Singhal yelling at her, when she attempted to leave the meeting, he stopped her by stepping in front of her physically putting his body between Ms. Hogg and the exit,  then began yelling at her about the empty wall-mounted hand sanitizers, despite full sanitizer bottles on the conference room table.  The CEO then began beating the wall-mounted hand sanitizer dispensers and continued screaming at Ms. Hogg.

50.

The CEO never yelled at any men like this, and not the men who were actually responsible for completing these tasks.

51.

Ms. Hogg tried to address the CEO's behavior with him one-on-one, explaining that it was very difficult to work with him amidst the harassment.  Mr. Singhal gaslit Ms. Hogg, telling her that it was her fault he yelled at her and that if she didn't frustrate him, he would not scream and insult her.

52.

Mr. Singhal did not respond when she told him that the yelling made her humiliated.

53.

All of this behavior by Mr. Singhal and others, tolerated and ratified by the Employer, made Ms. Hogg feel worthless and anxious that at any moment he would violently go off on her, making her job miserable when he was in town at the Georgia plant.

54.

Ms. Hogg was constantly on edge, emotionally upset, and terrified that she would be screamed at, ridiculed, and harassed.

55.

After so many years and success at the plant, Ms. Hogg did not want to leave her job. But she was also fed up with the conditions and knew something had to be done.

56.

On February 16, 2022, Ms. Hogg filed EEOC Charge No. 440-2022-03338, alleging discrimination in violation of Title VII and the ADEA.

57.

After filing her first Charge, the Employer subjected Ms. Hogg to numerous retaliatory actions, culminating in her termination.

58.

The Employer retaliated against Ms. Hogg by not giving her a raise when she was the *only support staff member* who did not receive a raise. While Jindal did not conduct performance reviews, she had not received any reprimands and instead had been given greater responsibility by the CEO. She also had consistently solid performance reviews prior to Jindal's ownership and a history of increasing responsibility and promotion.

59.

The Employer retaliated against Ms. Hogg when it removed her as the Company's representative on the local Chamber of Commerce Board, an action taken by the CEO to shame and embarrass her when Singhal refused to pay the Chamber dues and scoffed at her requests for him to do so. This role was important to Ms. Hogg personally and was a role in which she served for 31 years, served on the Board of Directors for 7 years, and for the last 4 years had served as the Chair of the Work Force Development Committee, all of which she lost because of Jindal's actions. It was a significant responsibility and position of visibility and importance for Ms.

Hogg because of the role Jindal played in the community and the role the Chamber played in the community.

60.

The Employer then excluded Ms. Hogg from the Company's organization chart, despite having worked for Company since it purchased the company from Exxon Mobile, where she had worked for approximately 23 years.

61.

Ms. Hogg confronted the CEO about the omission, and he dismissed her concerns stating she had no place in the organizational chart. This is patently absurd generally, but specifically because she was the Plant Administrator.

62.

One of the most degrading incidents involved the upkeep of the exterior of the property, which was not part of Ms. Hogg's responsibilities either in her job or within the additional duties Mr. Singhal required her to maintain this area after his assistants kept quitting. In April 2022, Mr. Singhal barked at a female receptionist to tell Ms. Hogg to clean up the "dog shit" outside the plant, putting the receptionist in the position of having to participate in Singhal's harassing conduct.  The receptionist was visibly uncomfortable in conveying the message.

63.

When Ms. Hogg responded to Mr. Singhal that she would call the appropriate individual to handle the geese droppings outside the plant, because of course she did not have the appropriate equipment to handle animal feces, he threateningly yelled at her, "I want you to clean up the dog shit."

64.

The Employer was aware of Mr. Singhal's harassing, demeaning, and debasing behavior toward Ms. Hogg and other women, tolerated it, did not stop it, allowed the behavior to continue, and did not reprimand him, and ratified such illegal behavior.

65.

In May 2022, Mr. Singhal further retaliated against Ms. Hogg by removing some of her job responsibilities, suggesting she was incompetent. He humiliated her in a meeting preceding this demotion by talking over her, engaging in "mansplaining" by demanding that a male manager explain Ms. Hogg's responsibilities, even though Ms. Hogg was sitting right there, ready and able to speak for herself.

66.

Mr. Singhal's discriminatory conduct was not limited to leadership meetings. He also levied his harassing criticisms at Ms. Hogg during periodic Town Hall

Meetings where 30-40 employees were present. When housekeeping or maintenance issued were raised at these meetings, Mr. Singhal yelled at Ms. Hogg and blamed her for these issues because she was a woman and, therefore, it was her job to take care of these tasks, even though they were responsibilities of other departments.

67.

Mr. Singhal's view of women as less than males was widely known in the Company, and tolerated, allowed to continue, and ratified by the Company because he often said so publicly.

68.

After the filing of her first Charge, when the issue of her complaints was raised by Mike Bryan, the Operations Manager, and Bruce Walton, HR Manager, Mr. Singhal specifically stated he could "get rid of her like that."

69.

Managers at the Company  labeled and nick-named Mr. Singhal a "walking liability" because his discriminatory behavior was so offensive and widely known.

70.

In a meeting with Managers and the Customer Service Group, Mr. Singhal said that women need to be managing the office and not operations.

71.

Mr. Singhal regularly berated women on customer services calls.

72.

Mr. Singhal did not allow women to participate in meetings and, in fact, told women Managers in meetings to "shut up."  He also required women to take notes, instead of participating substantively as their roles required.

73.

Mr. Singhal's vocal disdain for and treatment of women, which was tolerated, allowed to continue, and ratified by the Company, empowered other men in the Company to act in a discriminatory and harassing manner toward women.  As discussed above, Mr. Ellinghaus was supposed to correct and address this type of conduct, but instead joined in on the harassing conduct.

74.

The Operations Manager, Mr. Shakkar, also targeted women for mistreatment. He repeatedly engaged in discrediting women and ignoring their contributions. He even shoved a woman out of the way on one occasion.

75.

When Plaintiff Ray brought to Mr. Shakkar's attention that the EEOC protects women from such treatment, he scoffed at the suggestion, stating that he works for the "Jindal in India," and insinuating that federal law does not apply to him or Jindal.

76.

The discrimination, harassment, hostile environment allowed, tolerated, and ratified by the Company eventually led to the termination or quitting of at least seventeen (17) female employees.

77.

Ms. Hogg  was ultimately terminated on March 25, 2023, which was not wholly surprising since the CEO specifically said he could "get rid of her like that."

78.

The reasons offered for her termination were false and pretext.


**Facts as to Mr. Ray**

79.

At the time of his unlawful termination, Trampas Ray was fifty-three (53).

80.

Mr. Ray is a male and was an employee of Defendant and its predecessor for more than 25 years.

81.

Mr. Ray is the brother of Plaintiff Opal Hogg.

82.

Mr. Ray was trained in many areas of manufacturing at the plant, but at the time of his wrongful termination, he was a winder operator and safety coordinator.

83.

In February, 2022, Mr. Ray had a conversation with a coworker who also sometimes served as his former female supervisor, who Jindal had demoted back to the regular shift. They were discussing the supervisor's complaints of discrimination by Defendant paying males more than females and Mr. Ray made her aware of his sister's complaints to the Company HR and her Charge Ms. Hogg had filed with the EEOC.

84.

In April 2022, Mr. Ray discussed his sister's then pending EEOC Charge with Mr. Ellinghaus, the VP of HR. Mr. Ellinghaus acknowledged the CEO's discriminatory and harassing treatment of Ms. Hogg.

85.

Mr. Ray wanted to know, in light of this admission, why the discrimination and harassment had not stopped. He further added that the Charge should be resolved as the entire process was taking a toll on his sister. Mr. Ellinghaus indicated he would talk to the CEO and get back with Mr. Ray, but did never did so.

86.

In May 2022, Mr. Ray talked had a conversation with Margaret Franklin, Safety Manager, about the mistreatment of another female by Mr. Singhal. During this discussion, Ms. Hogg's treatment and Charge was also discussed.

87.

In August 2022, Mr. Ray made repeated complaints to Mr. Theyble Swint, a specialist and supervisor in the plant, about the discrimination his sister Ms. Hogg had suffered and the Company was allowing to continue.

88.

In November 2022, Mr. Ray addressed Mr. Singhal directly, asking why he treated Ms. Hogg and other females like he did.  Mr. Singhal did not contradict Mr. Ray's assessment of his discriminatory and harassing behavior, and instead put the blame on the women stating, "if they don't put my needs first it frustrates me."

89.

On February 14, 2023, Mr. Ray called out the Operations Manager, Mr. Shakkar, for his discriminatory treatment of women. Mr. Ray also made him aware of his sister's EEOC Charge.   The Operations Manager excused his own behavior by stating that he worked for Jindal in India and they don't have "stuff like that."

90.

On February 28, 2023, Mr. Ray received a heads up from a supervisor, Mr. Shaver, that people had noticed Mr. Ray going into Ms. Hogg's office frequently. When Mr. Ray pointed out that the increased scrutiny might be because of her EEOC Charge, Mr. Shaver said that people might be increasing their scrutiny of him, as well.

91.

Within a few months after Mr. Ray's assertion of Ms. Hogg's rights under Title VII, Jindal terminated Mr. Ray by telling him that they were conducting a purported reduction in force.

92.

Shortly after Jindal terminated Mr. Ray, they advertised on their website of the exact same jobs Mr. Ray had done at Jindal, thus demonstrating that the Reduction in Force ("RIF") was pretext.  Moreover, Jindal called back to work many of the people it let go during the purported RIF because they did not have enough employees to keep the manufacturing line running.

## COUNT I

## DISCRIMINATION AND DISPARATE TREATMENT OF MS. HOGG IN VIOLATION OF TITLE VII

93.

The Company discriminated against Ms. Hogg on the bases of gender, age, and national origin  in terms and conditions of employment.

94.

As described in this Complaint, the Company subjected her to extra scrutiny and adverse employment actions based on her gender and national origin.

95.

Jindal's discriminatory and disparate treatment of Ms. Hogg, because of her gender and national origin in terms and conditions of employment, adverse actions, and other conduct violates the statutory provisions and protections of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

96.

Jindal's acts and conduct constitute willful and intentional discrimination. Jindal engages in its discriminatory practices with malice or with reckless indifference to the protection of Ms. Hogg and her federal rights.

97.

The CEO, Vice President of Human Resources, and other high-ranking employees and senior managers were patently aware that Ms. Hogg was subjected to discrimination and disparate treatment, even participated in it, and Jindal ratified, tolerated, did not stop, and allowed such actions to continue for a prolonged period of time.

98.

At all times material to this litigation, Jindal had reasons to know, or through the exercise of due diligence and care should have known, of the discriminatory and disparate treatment by its agents and employees.

99.

Defendant failed to investigate Ms. Hogg's claim of discrimination and disparate treatment.

100.

Despite this knowledge of Ms. Hogg's complaints and knowledge of the discriminatory acts against Hogg on the basis of her gender and national origin by its agents and employees, the Defendant failed and even refused to intervene.

101.

The unlawful discriminatory actions and disparate treatment taken by Defendant and its agents and employees against Hogg on the basis of her gender and national origin were done during and within the scope of their agency and employment.

102.

As a direct result of Defendant's unlawful acts, Ms. Hogg has suffered damages, including but not limited to, back pay, front pay, loss of benefits, compensatory damages, expenses of litigation including attorneys' fees, and is entitled to the relief as set forth in the Prayer for Relief below.

## COUNT II

## RETALIATION AGAINST MS. HOGG
## IN VIOLATION OF TITLE VII

### 103.

Plaintiff Hogg complained about discrimination and hostile environment based on gender and national origin directly to her primary harasser, Mr. Singhal, and then to Human Resources, and other supervisors.

### 104.

Ms. Hogg was engaged in a protected activity by challenging the unlawful practices of Jindal, including but not limited to, her repeated requests for equal treatment and reprieve from harassment, and her internal complaints directly to the VP of Human Resources, and the CEO himself, and for discrimination based on gender, including but not limited to, extra scrutiny, hostile environment, ostracism, isolation, and intimidation.

### 105.

When Ms. Hogg  addressed these issues of discrimination and harassment based on gender and national origin with the VP of Human Resources, she was subjected to extra scrutiny, additional harassment, and other adverse conditions of employment, including the ultimate punishment of termination.

106.

Jindal wholly failed to investigate the validity of Ms. Hogg's charges that the harassment, discrimination, disparate treatment, and retaliation were based on her gender and national origin.  The Company repeatedly failed to address and remedy those claims.

107.

After the internal complaint made directly to Human Resources, Jindal through its officer, agents, and employees retaliated against her in terms and conditions of employment for her protected legal actions in violation of Title VII, 42 U.S.C. § 2000e-3(a), as amended.

108.

After Ms. Hogg reported discrimination to Mr. Ellinghaus, VP of HR, Defendant retaliated against her by changing her compensation from hourly to salary.  Ms. Hogg had amassed almost forty thousand dollars in overtime, so switching her to a salary resulting in a net decrease in her compensation of 20 thousand dollars.

109.

Ms. Hogg then filed a Charge with the EEOC in 2022, as discussed  and attached hereto, charging discrimination based on sex, age, national origin, retaliation, and hostile environment.

110.

The Company further retaliated against Ms. Hogg after and because she filed her first Charge with the EEOC.

111.

As a result of the wrongful termination, Ms. Hogg filed her second Charge No. 410-2023-07616 with the EEOC in 2023 alleging further retaliation.

112.

Jindal's acts and conduct constitute willful and intentional retaliation.   Jindal engages in its retaliation with malice or with reckless indifference to the protection of Ms. Hogg and her federal rights, as evidenced in part by the Vice President of Human Resources excusing and going along with Mr. Singhal's discriminatory conduct.

113.

The CEO, Vice President of Human Resources, and other high-ranking employees and senior managers were clearly aware that the Company was

discriminating and retaliating against Ms. Hogg, and Jindal ratified and allowed such actions to continue for a prolonged period of time.  These high-ranking individuals led and participated in the retaliatory conduct and ultimately her termination.

114.

The unlawful retaliation taken by Defendant and its agents and employees were done during and within the scope of their agency and employment.

115.

Jindal's retaliation against Ms. Hogg including extra scrutiny, disparate treatment, and retaliation, and ultimately termination violates the statutory provisions and protections of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

116.

Jindal's willful unlawful acts of retaliation have demonstrated its malice and reckless indifference to the right of Plaintiff to work in an environment free from retaliation for challenging unlawful actions, thereby entitled Plaintiff to punitive damages.

117.

As a direct result of Jindal's unlawful acts, Ms. Hogg has suffered damages, including but not limited to, back pay, front pay, loss of benefits, compensatory

damages, expense of litigation including attorneys' fees,  and is entitled to the relief as set forth in the Prayer for Relief below.

## COUNT III

## MS. HOGG: HOSTILE ENVIRONMENT AND HARASSMENT CLAIM BASED ON GENDER IN VIOLATION OF TITLE VII

118.

Defendant created a hostile work environment through its harassment of Ms. Hogg, a female, in the terms and conditions of employment, extra scrutiny, and hostile and aggressive comments and communications.

119.

Plaintiff is a member of a protect group, female.  She was subject to unwelcome sexual harassment based on her gender.

120.

Ms. Hogg has detailed in this Complaint numerous specific incidents of hostile environment and harassing conduct herein, but when Mr. Singhal was in town or other bad actors were present, not a day went by without a harassing comment or incident.

121.

Over 17 women were terminated or let go by the Company, and, upon information and belief, at least 7 women have filed their own Charges with the

EEOC, reflecting how systemic, severe, and pervasive the discrimination was for Ms. Hogg and other females.

122.

Defendant, though its CEO, VP of HR, and other managers, engaged in discriminatory, harassing, and abusive conduct that was unwelcome and was sufficiently severe and pervasive so as to alter the terms and conditions of Ms. Hogg's employment creating a hostile environment for Ms. Hogg and other females.

123.

At all times material to this litigation, Defendant had reason to know, or through the exercise of due diligence and care should have known, of the hostile environment created by its agents and employees. Despite this knowledge, Jindal failed and even refused to intervene, and ratified such behavior and hostile environment by allowing it to continue.

124.

Upon information and belief the Company purportedly said it required Mr. Singhal to engage in coaching after some complaints from various women surfaced, but he refused to do so, and the Company did not enforce that requirement. Mr. Singhal faced no consequences for refusing to abide by federal law and the internal

policies regarding harassment and discrimination, and allowing the hostile environment to continue.

125.

Upon information and belief, the Company did not require any manager or officer to participate in counseling or take any action to stop the harassment, discrimination, and continuance of the hostile environment.

126.

The unlawful actions in harassment and creating and allowing a hostile based on gender and national origin taken by Defendant and its agents and employees were done during and within the scope of their agency and employment.

127.

Jindal's willful unlawful acts of allowing the creation and continuation of a hostile environment based on gender and national origin have demonstrated its malice and reckless indifference to the right of Plaintiff Hogg to work in an environment free from hostile environment, thereby entitled Plaintiff Hogg to punitive damages.

128.

As a direct result of Jindal's unlawful acts, Ms. Hogg has suffered damages, back pay, front pay, loss of benefits, compensatory damages, expense of litigation

including attorneys' fees, and is entitled to the relief as set forth in the Prayer for Relief below.

## COUNT IV

## AGE DISCRIMINATION AGAINST MS. HOGG UNDER ADEA

### 129.

Ms. Hogg is over 40 years old and was 61 years of age at the time of the EEOC charge.

### 130.

Mr. Singhal always requested younger executive assistants and never offered the position to Ms. Hogg, even though he repeatedly asked her to perform those duties when he was without help in that position.

### 131.

All but one of his executive assistants was under the age of forty (40).

### 132.

The only executive assistant who was not under 40 only lasted one day due to Mr. Singhal's harassing conduct.

### 133.

Mr. Singhal asked HR to find younger employees, and HR complied.

134.

When Ms. Hogg complained to HR about the amount of work on her plate because she was filling in for Mr. Singhal's executive assistants, Jenna Jordan, HR Recruiter, apologized and admitted it was very hard to find younger assistants in LaGrange, Georgia. The Company and its HR tolerated and ratified the CEO's discrimination against protected employees over age 40.

135.

The Employer discharged Plaintiff Hogg from a previously held position.

136.

The Employer discriminated against Plaintiff Hogg and she suffered adverse employment actions, including requiring her work more with fewer and fewer resources and personnel, extra scrutiny, and ultimately termination, because of her age.

137.

Employer terminated Plaintiff Hogg on the basis of age.

138.

The reasons offered for her termination were false and pretext.

139.

Upon information and belief, the Employer replaced Ms. Hogg with two substantially younger workers performing Ms. Hogg's job task, but gave them different job titles.

140.

Employer's treatment of Ms. Hogg because of her age, in terms and conditions of employment, conduct, and termination, acts and conduct violated the ADEA, 29 U.S.C. §§ 621, et seq., entitling Plaintiff to all remedies and recovery against the Employer allowed Plaintiff under the ADEA.

141.

Employer's acts and conduct constitute willful and intentional age discrimination.  Employer has engaged in its discriminatory practices intentionally and/or with malice and/or with reckless indifference to Ms. Hogg's rights.

142.

As a direct and proximate result of Defendant's violations of the ADEA, Plaintiff Hogg has suffered damages, including but not limited to, back pay, front pay, loss of benefits, Plaintiff is entitled to the relief as set forth in the Prayer for Relief below.

143.

The Defendant's discrimination against Plaintiff Hogg on the basis of age was willful, entitling Plaintiff to recover liquidated damages under the ADEA.

## COUNT V

## INTERSECTIONAL HOSTILE ENVIRONMENT AND HARASSMENT TOWARD MS. HOGG IN VIOLATION OF TITLE VII

144.

Plaintiff Hogg is a White Female American.

145.

Jindal also has a company location in the country of India and many employees, especially in management, are from India and are of Asian National Origin.

146.

Plaintiff Hogg shows that at Defendant Jindal, White Americans were treated differently that those persons of Asian National Origin, and this treatment was discrimination toward White Americans, was favorable to individuals of Asian National Origin, and was led and ratified by management of Asian National Origin.

147.

When Asian individuals were going to be present at a meeting, Mr. Singhal made Ms. Hogg sit down with a check list and review the exact number of supplies

needed and then go over the checklist again, stressing the importance of all of these tiny things like number of pens and notebooks. Meanwhile, when a meeting of all American employees was occurring, no such double checking was made.

148.

Employees of Asian/Indian National Origin, including Mr. Singhal and Mr. Anaureth, assistant to Mr. Jindal,, talked down to and were demeaning to Ms. Hogg. These same individuals treated workers of Asian National Origin, like Ms. Saloney Ganesh, assistant to Mr. Jindal, with respect and did not talk down to or demean them.

149.

There were no individuals of Asian National Origin in administrative positions at Jindal; all were in business leadership positions.

150.

Americans were not given company cars; only Asians were given company cars, even Asians who lived in the US full time.

151.

The Company provided special meals for Asians with dietary preferences, but not such considerations were made for Americans with dietary preferences or needs.

152.

Singhal made it clear that his and the Company's preferential treatment of Asians was on purpose because, in his opinion stated loudly, repeatedly, Americans do not work as hard as Asians.

153.

The Company created, tolerated, allowed to continue, and ratified a hostile work environment through its disparate treatment of Ms. Hogg, a Female White American, based on gender, in the terms and conditions of employment, extra scrutiny, hostile and aggressive comments and communications.

154.

The Company's discriminatory, harassing, and abusive conduct was unwelcome and was sufficiently severe and pervasive so as to alter the terms and conditions of her employment.

155.

The harassing and abusive conduct was based on the intersection of Hogg's gender.

156.

Senior managers were clearly aware that Ms. Walker was suffering from hostile environment based on gender, and the Company tolerated, did not stop, ratified, and allowed such actions to continue.

157.

At all times material to this litigation, the Company had reasons to know, or through the exercise of due diligence and care should have known, of the hostile environment created by its agents and employees. Despite this knowledge, the Company failed and even refused to intervene.

158.

The unlawful actions in creating and allowing a hostile environment taken by Defendant and its agents and employees were done during and within the scope of their agency and employment.

159.

Jindal's willful unlawful acts in allowing the creation and continuation of a hostile environment have demonstrated its malice and reckless indifference to the right of Plaintiff Hogg to work in an environment free from hostile environment, thereby entitling Plaintiff Hogg to liquidated damages.

160.

As a result of Defendant's unlawful acts, Ms. Hogg has suffered damages, back pay, front pay, loss of benefits, compensatory damages, expense of litigation including attorneys' fees, and is entitled to the relief as set forth in the Prayer for Relief below.

## COUNT VI

## TITLE VII: RETALIATION AGAINST PLAINTIFF RAY FOR OPPOSING DISCRIMINATION

161.

Plaintiff Trampas Ray complained to numerous coworkers and supervisors and even the CEO about the discriminatory and harassing treatment his sister received based on her age and gender.

162.

Mr. Ray openly discussed Ms. Hogg's internal claims and EEOC complaint, as well as general allegations of discriminatory conduct against her and other female employees, including older women.

163.

Mr. Ray made such complaints as early as January 2022 and a formal complaint to Mr. Ellinghaus,  VP of Human Resources, in April 2022, and then had numerous discussions with managers, supervisors, and coworkers thereafter asserting the same issues.

164.

Mr. Ray spoke with Mr. Shaver, then Mr. Rays' supervisor, about the discrimination, harassment, and toward his sister, and hostile work environment, based on her age and gender, and told Shaver that Ms. Hogg had filed a discrimination Charge with the EEOC, less than two weeks prior to his termination. Mr. Shaver stated he did not blame Ms. Hogg for filing because everybody knew how they treated women at the Company.  He also warned Mr. Ray that they were looking at him as well.

165.

Due to the temporal proximity, among other reasons, Defendant termination Mr. Ray in retaliation because of his protected activity of complaining about and reporting gender and age discrimination, harassment, and retaliation generally in the workplace and specifically as it related to his sister.

166.

Mr. Ray engaged in a protected activity by challenging the unlawful practices of Jindal, including but not limited to, his reports to the CEO, HR, and his supervisors about Ms. Hogg's experience of discrimination, about the treatment of other female and older employees, and Ray's complaints regarding supervisors' repeated failures to do anything about either.

167.

When Mr. Ray  addressed these issues, he was subjected to extra scrutiny, and other adverse conditions of employment, including the ultimate punishment of termination.

168.

Jindal wholly failed to investigate the validity of Mr. Ray's allegations that Ms. Hogg's harassment, discrimination, disparate treatment, hostile work environment, and retaliation were based on her gender and age, and failed to investigate the discriminatory treatment of other female employees.  The Company repeatedly failed to investigate, address, and remedy those claims.

169.

After Mr. Ray's internal complaint directly to the VP of Human Resources, Jindal through its officer, agents, and employees retaliated against Mr. Ray for his protected legal actions in violation of Title VII, 42 U.S.C. § 2000e-3(a), as amended.

170.

Defendant Jindal acted in reprisal and retaliation against Mr. Ray for challenging its unlawful actions in violation of Title VII, 42 U.S.C. § 2000e-3(a), as amended.

171.

The unlawful retaliatory actions taken by Defendant and its agents and employees against Mr. Ray were done during and within the scope of their agency and employment.

172.

Jindal's willful unlawful acts of retaliation have demonstrated its malice and reckless indifference to the right of Plaintiff to work in an environment free from retaliation for challenging unlawful actions, thereby entitling Plaintiff to punitive damages.

173.

As a result of Jindal's unlawful acts, Mr. Ray has suffered damages, back pay, front pay, loss of benefits, compensatory damages, liquidated damages, expenses of litigation including attorneys' fees, and is entitled to the relief as set forth in the Prayer for Relief below.

## **COUNT VII**

## **TITLE VII: THIRD PARTY "ZONE OF INFLUENCE" RETALIATION AGAINST PLAINTIFF RAY**

174.

Plaintiff Ray is Plaintiff Hogg's brother. It was well known throughout the plant and the Company that Plaintiffs are related by blood, as the two had worked at the plant together for over 25 years.

175.

Mr. Ray was within the zone of interests Title VII was designed to protect as a family member of a complainant.

176.

Upon information and belief, Mr. Ray kept personal items in Ms. Hogg's office and his trips to her office were noticed by others and in part explained by their relationship as siblings.

177.

Mr. Ray's supervisors were close with Mr. Singhal, Ms. Hogg's supervisor.

178.

Mr. Ray's supervisors were aware of Ms. Hogg's complaints both because of their relationship to Mr. Singhal and because of Mr. Ray's direct comments and questions to his supervisors about the discrimination Ms. Hogg had experienced and specifically Jindal's failure to do anything about it.

179.

Jindal terminated Mr. Ray because of his relationship to Ms. Hogg, thus giving rise to liability based on Mr. Ray's third-party claim of retaliation.

180.

Jindal fired Mr. Ray because of and as retaliation for Ms. Hogg's complaints of discrimination as punishment calculated to injure Ms. Hogg further.

181.

Ms. Hogg's complaints are a but-for cause of Defendant terminating Mr. Ray's employment when he was one of the most qualified and trained persons in his department and in the plant at the time; and particularly, since Defendant retained less skilled and less qualified employees, and even called such less skilled and less qualified employees back to work, but did not call Mr. Ray back to work.

182.

Jindal fired Mr. Ray and Ms. Hogg within two days of each other.

183.

Defendant Jindal acted in reprisal and retaliation against Mr. Ray for challenging its unlawful actions in violation of Title VII, 42 U.S.C. § 2000e-3(a), as amended.

184.

As a result of Jindal's unlawful acts, Mr. Ray has suffered damages, back pay, front pay, loss of benefits, compensatory damages, liquidated damages, expenses of litigation including attorneys' fees, and is entitled to the relief as set forth in the Prayer for Relief below.

## COUNT VIII

## AGE DISCRIMINATION AGAINT MR. RAY UNDER ADEA

### 185.

Plaintiff Ray was qualified for his position as a winder, certified in lab, extrusions, recycle, slitting, and material handling at Employer.  He had good performance reviews and no attendance issues.

### 186.

Plaintiff Ray was fifty-three at the time of his termination.

### 187.

In March 2023, Employer told Plaintiff Ray that Defendant was making a reduction in force as the reason for his termination.

### 188.

Employer discharged Plaintiff Ray from a previously held position.

### 189.

Many of those who were not laid off during the reduction in force had attendance and performance issues, while Mr. Ray did not.

190.

Among the twelve employees laid off during the purported Reduction in Force, ("RIF"), there were four employees from three different shifts.

191.

After the terminations, Jindal began advertising for winder techs on their website and other job websites, the exact job Mr. Ray was performing.

192.

Employer also posted other jobs for which Mr. Ray was qualified, including jobs for which he had trained and previously performed.

193.

The Employer has called back many of the employees let go during the purported RIF.

194.

Indeed, the Employer was so short on employees that they did not have enough employees to run all of the lines.

195.

Upon information and belief, the Employer researched the personnel history to find past employees from the last three years to call back to work.

196.

While many employees were called back to keep the lines running, Mr. Ray was not recalled despite his 25 years of experience and significant training and expertise.

197.

Employees who were called back and replaced Mr. Ray were substantially younger than him.  Upon information and belief, new hires were also substantially younger than Mr. Ray.

198.

At the time of Mr. Rays' termination, the Reduction in Force was false and pretextual.

199.

Employer terminated Plaintiff on the basis of age.

200.

Employer's treatment of Mr. Ray because of his age, in terms and conditions of employment, conduct, and termination, acts and conduct violated the ADEA, 29 U.S.C. §§ 621, et seq., entitling Plaintiff to all remedies and recovery against the Employer allowed Plaintiff under the ADEA.

201.

Employer's acts and conduct constitute willful and intentional age discrimination.  Employer has engaged in its discriminatory practices intentionally and/or with malice and/or with reckless indifference to Mr. Ray's rights.

202.

As a direct and proximate result of Defendant's violations of the ADEA, Plaintiff Ray has suffered damages, including but not limited to, back pay, front pay, loss of benefits, Plaintiff is entitled to the relief as set forth in the Prayer for Relief below.

203.

The Defendant's discrimination against Plaintiff Ray on the basis of age was willful, entitling Plaintiff to recover liquidated damages under the ADEA.

## <u>COUNT IX</u>
## <u>STATE LAW NEGLIGENT RETENTION</u>

204.

Jindal knew, or, in the exercise of ordinary care, should have known, that its employees, including but not limited to, Singhal, Ellinghaus, and others were engaging in, and had previously engaged in, unlawful conduct against women, and Plaintiffs specifically.

205.

Jindal had received numerous complaints about Mr. Singhal's harassing conduct long before Ms. Hogg ever complained, formally or informally.

206.

As a result of one such woman's complaint, Mr. Singhal was required to attend "coaching" to improve his behavior, but he refused to do so, and the Company did not enforce the requirement.

207.

Singhal suffered no consequences as a result of his failure to participate in coaching.

208.

Mr. Singhal's refusal to reform his behavior or receive corrective action is further evidence that Jindal knew that Mr. Singhal was engaging in and would continue to engage in discriminatory behavior unless and until he was terminated for his conduct.

209.

Indeed, even the VP of Human Resources engaged in similar discriminatory and harassing conduct.

210.

Despite Defendant's actual and constructive knowledge of the propensities of those employees to engage in such unlawful conduct, it negligently retained those employees.

211.

Employer allowed Ms. Hogg to be harassed in the workplace because of her gender and allowed her to be treated poorly as compared with males and those of Asian National Origin.

212.

Employer allowed employees to retaliate against Ms. Hogg and Mr. Ray because they tried to take action against the Company for the discriminatory actions of Singhal and others.

213.

As a direct and proximate result of Employers' negligent retention of those employees, Plaintiffs were treated in unlawfully in the workplace, suffered damages, and are entitled to damages, including costs and attorney's fees under O.C.G.A. § 13-6-11, and all other applicable Georgia laws.

214.

Jindal's actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.  As a result, the Plaintiffs are entitled to punitive damages against Employer under O.C.G.A. § 51-12-5.1.

215.

Employer's actions were taken with the direct intent to harm Plaintiffs Hogg and Ray; therefore, there is no cap on punitive damages under  O.C.G.A. § 51-12-5.1(f).

**WHEREFORE**, Ms. Hogg and Mr. Ray respectfully invoke the powers of this Court and pray for the following:

a)   That the Court grant trial by jury;

b)   That Plaintiffs have and recover from Defendant all amounts available under Title VII and the ADEA including but not limited to back pay, front pay, compensatory damages, liquidated damages, damages for mental anguish, benefits, and punitive damages in an amount sufficient to deter such discriminatory conduct in the future;

c) That Plaintiffs have judgment on their state law claim against Employer;

d) That Plaintiffs be awarded all general, special, consequential, and inconsequential damages for their state law claim of negligent retention in an amount to be determined by the enlightened conscience of an impartial jury;

e) That Plaintiffs be awarded punitive damages on their state law claim:

f) That the Court award pre-judgment and post-judgment interest to Plaintiffs on all of the above amounts;

g) That Plaintiffs be awarded their expenses of litigation, including the costs of this action, and her reasonable attorneys' fees; and

h) That the Court grant such other and further relief as it deems just and proper.

**RESPECTFULLY SUBMITTED**, this 7th day of May, 2024.

/s/ *Mary A. Prebula*
Mary A. Prebula
Georgia Bar No. 586743
PREBULA & ASSOCIATES LLC
ATTORNEYS AT LAW
5555 Glenridge Connector
Suite 200
Atlanta, GA 30342
(770) 495-9090
mprebula@prebulallc.com